UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------X

UNITED STATES OF AMERICA,

Plaintiff,

MEMORANDUM and ORDER

v.

00-CR-1248 (NGG)

JONATHAN WINSTON, et al.

Defendants.

-----------------------------------------------------X

GARAUFIS, U.S. District Judge.

The defendants in this case are charged with various counts of securities, mail and wire fraud, and conspiracy to commit these crimes. Some of the defendants are also charged with money laundering, engaging in unlawful monetary transactions, and conspiracy to commit these crimes. The Second Superseding Indictment (the "Indictment") names twenty four defendants, many of whom have already plead guilty. Defendants Jason Cohen, Hunter Adams, Gregg Adams, Robert Lisnoff, David Hirsch and Michael Reiter, have filed motions asking this Court to compel the Government to provide a Bill of Particulars. Several of the defendants have made other discovery motions regarding disclosure of Brady and Giglio material, disclosure of 404(b) evidence, disclosure of Jencks Act material and disclosure of other discovery materials. Additionally, other defendants move to suppress certain evidence, and to strike various portions of the indictment. Finally, several defendants have asked this Court for a severance of trial. I am reserving judgment on the issue of severance. The remaining motions are granted in part and denied in part.

1

## I. Factual Allegations of the Indictment

The following factual allegations are set forth by the Indictment:

From February of 1994 through March of 2001, the defendants participated in a scheme to inflate the market price of various securities of ten companies. The scheme began at a brokerage firm called First United Equities, which was owned and managed by defendants Jonathan Winston, Jason Cohen and Hunter Adams. Defendants Gregg Mangiarano and Gregg Adams participated in the management as well.[1] Subsequently, the scheme spread to other brokerage firms, which were either started by or acquired by individuals associated with First United. The other defendants are accused of acting as brokers, managers, traders and stock promoters.

The defendants are charged with fraudulently inflating the value of various publicly traded securities. Although different brokerage firms were used for acquiring the securities, the activities at each of the firms followed a similar pattern. First, a group of the defendants acquired secret control of stocks and warrants of several thinly capitalized companies (the "House Stocks"). The defendants then placed the House Stocks in accounts that were in names other than their own (the "Nominee Accounts"). Once in control of the House Stocks, the defendants illegally inflated the prices of the House Stocks.

The illegal tactics employed by the defendants consisted of: (a) making of materially false and fraudulent representations to retail customers; (b) using high pressure and deceptive sales tactics; (c) failing to take and execute orders; (d) executing sale of stock only when it could be

---

[1]Jonathan Winston is no longer a movant in this case.

"crossed" with a purchase of the same stock by another customer; (e) threatening bodily harm to brokers who would not further the fraudulent scheme; and (f) threatening bodily harm against persons who attempted to take action that would lower the value of the stocks. Once the market price of the House Stocks was sufficiently inflated, defendants proceeded to sell their shares of the House Stock.

Upon selling the House Stocks, defendants were left with millions of dollars of proceeds. To conceal the fraud and the identity of the ownership of the proceeds, Defendants Jason Cohen, Hunter Adams, Michael Reiter, Gregg Adams, Alan Berkun and Roberto Mangiarano laundered the money through various foreign and domestic bank accounts.

## II. Motion to Compel the Government to Provide a Bill of Particulars Pursuant to Rule 7(f)

### A. Legal Standard for Granting a Bill of Particulars

A Bill of Particulars allows a defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling the defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). Under Rule·7(f), the granting of a Bill of Particulars lies within the sound discretion of the district court. United States v. Panza, 750 F.2d 1141 (2d Cir. 1984). A Bill of Particulars merely allows the defendant to understand the nature of the charge, it should not be used as an investigative tool by the defendant. United States v. Salazar, 485 F.2d 1272, 1277-78 (2d Cir. 1973), cert. denied, 415 U.S. 985, (1974). Therefore, "a bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused of." United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990), cert. denied, 498

3

U.S. 906, (1990).

## B. The Specific Demands

Most of the moving defendants have filed separate motions for Bills of Particulars.
While I will specifically rule on each motion, I will first rule on the motions that contain
demands that are common to the other defendants. I will then rule on the other motions, relying
for the most part on my analysis already set forth in this opinion.

### 1. Jason Cohen

Defendant Jason Cohen makes the following demands for particulars:

(i) Disclose the names and addresses of all known and unindicted co-conspirators. See
Cohen's Memorandum of Law in Support of his Pre-Trial Motions ("Cohen's Mem."), at 7.
Courts in this Circuit have taken varying views as to the appropriateness of requiring the
Government to provide defendants with the names of unindicted co-conspirators. See United
States v. Killeen, 1998 U.S. Dist. LEXIS 17134, at *14-15 (S.D.N.Y. Oct. 29, 1998) (citing
cases that have both denied and granted similar requests). The function of a Bill of Particulars is
to allow a defendant to "identify with sufficient particularity the nature of the charge pending
against him, thereby enabling defendant to prepare for trial [and] prevent surprise." Bortnovsky,
829 F.2d at 574. "The ultimate test must be whether the information sought is necessary, not
whether it is helpful." United States v. Miltof, 165 F.Supp.2d 558, 569 (S.D.N.Y. 2001)
(emphasis added).

In this case, the Indictment specifies the brokerage firms and the House Stocks involved
in the conspiracy. Additionally, defendants are aware of more than thirty individuals who were
associated with the alleged fraud. Finally, the Government will be providing the defendants with

4

more detailed information pursuant to this order. Disclosing the identities of unindicted co-conspirators in this case will not further clarify the nature of the charges pending against the defendants. Because the information sought is not "necessary," defendants' motion to disclose the names and addresses of unindicted co-conspirators is denied.

(ii) Disclose the substance of the alleged fraudulent representations charged in Paragraphs 44 and 50 of the Indictment. See Cohen's Mem. at 7. The Indictment alleges that as part of the manipulation, defendants "made and caused to be made materially false and fraudulent representations to retail customers in order to induce those customers to purchase House Stock." (Ind. ¶ 44). It also accuses the defendants of making "materially false and misleading statements to persuade customers not to sell House Stocks." (Ind. ¶50). The Indictment does not discuss the substance of these false and fraudulent representations.

Courts have consistently required the Government to disclose details of fraudulent statements when it is aware of the precise statements it alleges were fraudulent. See United States v. Trie, 21 F.Supp. 2d 7, 38 (D.D.C. 1998) ("A defendant faced with false statements charges should not have to waste precious pre-trial preparation time guessing which statements he has to defend against...when the government knows precisely the statements on which it intends to rely and can easily provide the information."); United States v. Rogers, 617 F. Supp. 1024, 1029 (D. Colo. 1985) ("General allegations of false statements and testimony are not sufficient. This criminal case should not differ from any civil matter where allegations of fraud and misrepresentations must be pleaded with particularity under Fed.R.Civ.P. 9(b). In fact, application of this rule in criminal cases is even more compelling than in civil matters because defendants' liberty interests are at stake."); United States v. Clifford, 426 F.Supp. 696, 703 n. 4

5

(E.D.N.Y. 1976) (in a false allegation charge "[t]he starting point for everything is the statement.").

Here, Cohen requests the substance of the fraudulent representations made to customers to induce them to buy, and later to prevent them from selling, the House Stock. The underlying elements of the charges against them require proof of false representations. To properly defend themselves, the defendants will either have to demonstrate that these statements were not made or that they were not fraudulent. Consequently, this information is necessary to their defense. Accordingly, the Government must provide the defendants with the substance of the false and fraudulent statements referred to in Paragraphs 44 and 50 and name the defendants that made the false and fraudulent statements.

(iii) Identify the unauthorized trades made to retail customers as well as the "crossed" trades. See Cohen's Mem. at 8. The Indictment states that defendants made unauthorized trades in customers' accounts and would only sell their customers' House Stock if it could be "crossed" with a purchase for the same stock by another customer. (Indict. ¶¶ 44 and 50). In United States v. Bortnovsky, the district court denied defendants' motion for similar requests. Bortnovsky, 820 F.2d at 572. The Second Circuit reversed because the information that the defendants sought was necessary for them to prepare an adequate defense. Id.

In Bortnovsky, the defendants were accused of submitting false and inflated claims for burglary losses. The indictment did not disclose the dates of the alleged burglaries, nor did it provide information pertaining to falsified documents. The defendants moved for a Bill of Particulars, asking the Government to specifically state the dates of the fabricated burglaries and to identify the falsified documents. The Government's response was that they made the charges

6

sufficiently clear, by providing the defendants with over 4,000 documents. The district court denied defendants' motion. At trial, the Government introduced documents relating to twelve burglaries, even though the defendants were accused of fabricating only four burglaries. Upon appeal, the Second Circuit held that by failing to identify the burglaries defendants were accused of fabricating, defendants "were forced to explain the events surrounding eight actual burglaries and to confront numerous documents unrelated to the charges pending. In effect, the burden of proof was impermissibly shifted to the appellants....The Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents will be proven falsified or which of some fifteen burglaries will be demonstrated to be staged." Bortnovsky, 820 F.2d at 575.

Here, the defendants are accused of making unauthorized trades in customers' accounts and failing to execute their customers' sale of House Stock unless it could be crossed to other customers. The defendants were operating out of brokerage firms and may have made thousands of legitimate trades, unrelated to the unauthorized trades they are accused of making. By failing to identify which trades were unauthorized, defendants may have to legitimize trades that are unrelated to the unauthorized trades, thereby shifting the burden of proof to the defendants. Therefore, defendants' motion to compel the Government to identify the unauthorized and crossed trades is granted.

(iv) "Identify Winston, Cohen and Adams' alleged nominee or nominee accounts in which they allegedly obtained stock in the following IPOs: National Medical IPO; Ashton IPO; Mama Tich IPO. Identify the nominee accounts in which Winston and Cohen allegedly held (a) Ossage stock, (b) Skynet stock, and (c) CNFT stock. As to paragraph 76(a), identify the nominee

7

accounts into which the Ashton warrants allegedly were placed." Cohen's Mem. at 8. For the same reasons that the Government must disclose the false and fraudulent statements, it must also identify the nominees and the nominee accounts that defendants used to purchase and sell the House Stock. The defendants are charged with "engaging in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of the securities." (Ind. ¶ 75(a)). According to the Indictment, the defendants sold the House Stock to the investing public from these accounts. (Ind. ¶¶ 38 & 39). It is through these accounts that the defendants allegedly defrauded investors in connection with the sales of securities. Therefore, defendants need this information to adequately prepare a defense. Accordingly, the Government must provide the defendants with the names of the nominees and the nominee accounts.

(v) Disclose the date of the threats, the persons who made the threats, the name of the person to whom the threat was made, and the account as to which the threat relates. See Cohen's Mem. at 8. Paragraph 50 of the Indictment accuses the defendants of threatening bodily harm against brokers who did not further their fraudulent scheme by selling House Stock to customers. It also alleges that defendants threatened individuals who engaged in transactions that caused the price of the House Stock to depreciate. This request is granted. See United States v. Davidoff, 845 F.2d 1151, 1153 (2d Cir. 1988) (holding that failure to provide defendants with particular threats made in an extortion charge was reversible error).

(vi) Confirm that the fraud charged in Counts Two through Fifteen of the Indictment is based on the same factual allegations of the prior paragraphs of the Indictment. See Cohen's Mem. at 8. This request is also granted. Counts Two through Fifteen, which charge defendants

8

with securities fraud, do not allege new facts. Instead, they rely on the allegations of prior

paragraphs. Defendants simply wish to confirm that the fraud alleged in Counts Two through

Fifteen is the same as that alleged in prior paragraphs of the Indictment. I see no reason why

defendants should not be provided with such basic information. The Government must confirm

whether or not the fraud charged in Counts Two through Fifteen of the Indictment is based on the

prior factual allegations of the Indictment.

## 2. Hunter Adams

Defendant Hunter Adams makes the following demands for particulars:

(i) Disclose "the names, aliases and addresses of each and every alleged unindicted co-

conspirator known to the government." Hunter Adams's Memorandum of Law in Support of his

Pre-Trial Motions ("Hunter Adams's Mem.") at 32. This request is denied for the same reason I

denied Cohen's request for information pertaining to co-conspirators.

(ii) Provide details regarding "the manner in which Mr. Adams and his co-defendants are

alleged to have manipulated the market price of First United House Stocks and Preston Langley

House Stocks." Hunter Adams's Mem. at 32. This request is denied, as it seeks information that

is inappropriate for a Bill of Particulars. It is well settled that the Government need not disclose

information relating to the manner by which the defendant committed the crime charged. See

United States v. Perez, 940 F.Supp 540, 550-51 (S.D.N.Y. 1996); United States v. Boneparth, 52

F.R.D. 544, 545 (S.D.N.Y. 1971) ("[T]he manner or means by which a crime is carried out

constitute evidentiary matter"); United States v. Mitlof, 165 F.Supp. 2d 558, 570 (S.D.N.Y.

2001) ("The government may not be compelled to provide a bill of particulars disclosing the

manner in which it will attempt to prove the charges, the precise manner in which the defendant

9

committed the crime charged, or a preview of the Government's legal theories.").

(iii) With respect to paragraph 44 of the indictment, specify: (a) the false and fraudulent representations made by Adams and his co-conspirators; (b) the manner in which high pressure and deceptive sales tactics were used to induce customers to purchase House Stock; (c) to whom excessive, undisclosed commissions and sale credits were paid; and (d) in whose accounts were unauthorized trades made. See Hunter Adams's Mem. at 32-33. Requests (a), (c) and (d) are granted consistent with my analysis of Cohen's second and third requests, except that the Government need not provide information relating to unindicted co-conspirators. Request (b) is denied because the "manner" in which a crime was committed need not be disclosed.

(iv) With respect to paragraph 50 of the Indictment, specify: (a) each sale order in House Stock that Adams or his alleged co-conspirators refused to take and execute; (b) each crossed or matched order referred to in ¶ 50(c); (c) each manipulated order and execution referred to in ¶ 50 (d); (d) the date and time of each threat referred to in ¶¶ 50 (e) and (f), the individual(s) who allegedly made the threat, the individual(s) to whom the threat was allegedly made, and the account as to which the alleged threat relates." See Hunter Adams's Mem. at 33. All these requests are granted consistent with my analysis of Cohen's second and third requests.

(v) Disclose where the defendants are currently keeping "millions of dollars in profits" that they made through their dealings in the House Stock. See Hunter Adams's Mem. at 33. This demand is denied. Details regarding where defendants are currently keeping the profits are evidentiary in nature and the Government need not disclose that information prior to trial.

(vi) "With respect to ¶57 of the Indictment, state the date, time and number of shares of IRT stock traded in connection with each of the alleged prearranged trades in IRT stock in the

10

account of a company called Apollo Equities Trade Corporation." Hunter Adams's Mem. at 33. This demand is denied. The Indictment states where the account was located and which securities were traded. This is sufficiently detailed to allow Adams to defend the charge. Adams's similar requests regarding Paragraphs 67 and 68 are denied for similar reasons.

(vii) "With respect to ¶¶ 58 and 59 of the indictment, state the name and last known address and telephone number for each of the alleged nominees." Hunter Adams's Mem. at 33. The Government does not have to provide the addresses of the nominees, but it must disclose the nominees' names and accounts.

(viii) With respect to Paragraphs 104, 106, 108, 110, 112, 118, 120, 124, 132 and 134, state the name of the account holder into which the government alleges funds were transferred by Adams and Berkun. See Hunter Adams's Mem. at 33-34. This request is denied as well. The Indictment specifically provides the names of the banks to which the monies were sent, the dates of the transfers, and the amount of each transaction. This is sufficiently detailed to allow defendants to prepare for trial.

### 3. Gregg Adams

Defendant Gregg Adams makes the following demands for particulars:

(i) Specify how Gregg Adams supervised brokerage firms Lexington Capital and Preston Langley, and identify which documents the Government plans on using to prove this. Specify how Roberto Mangiarano supervised brokerage firms Lexington Capital and Stockton Equities, and identify which documents the Government plans on using to prove this. See Gregg Adams's Memorandum of Law in Support of his Pre-Trial Motions ("Gregg Adams's Mem.") at 34-35. These demands seek information and documents that are evidentiary in nature. Therefore, the

11

request is denied. (See the discussion on Hunter Adams's second request.)

(ii) "With respect to the alleged scheme to manipulate the market price of First United [and Lexington Capital/Preston Langley] House stocks and stock warrants: (a) identify the alleged fraudulent and false representations made by the defendants or alleged co-conspirators in connection with the sale of the security; (b) identify the unauthorized trades made in retail customers accounts; (c) identify the crossed orders; (d) as to each 'threat' allegedly made to brokers or short sellers, state the date of the threat, the name of the person who allegedly made the threat, the name of the person allegedly threatened, and the account as to which the threat relates." Gregg Adams's Mem. at 35. These demands are granted pursuant to my analysis of Cohen's second, third and fifth requests.

(iii) "Identify Gregg Adams's and Mangiarano's alleged nominees or nominee accounts through which they allegedly controlled their shares of First United House stocks, and Preston Langley house stocks." Gregg Adams's Mem. at 35. This demand is granted pursuant to my analysis of Cohen's fourth request.

(iv) "With respect to each of counts one through fifteen, if the fraud alleged is anything other than manipulation of stock by the means specified in paragraphs one through seventy six, specify the fraudulent scheme and/or fraudulent statement, and/or the acts, practices and courses of business which operate as a fraud and deceit." Gregg Adams's Mem. at 35. This request is granted. There is no reason why the defendants should not be entitled to such basic information to allow them to prepare a defense.

(v) "With respect to each count, fifty-four, sixty three and sixty four, identify the bank account numbers and the accounts into which the money was transferred." Gregg Adams's Mem.

12

at 36. This request is denied for the same reason as Hunter Adams's eighth request.

### 4. Joseph Mannino[2]

Joseph Mannino's motion contains numerous requests pertaining to the intricate details of the conspiracy. Specifically, it requests the dates, times and locations pertaining to the defendants' actual agreement, acts in furtherance of the conspiracy, and acts taken to conceal the conspiracy. It also requests statements made by each defendant in furtherance of the conspiracy. These requests are denied. "Details as to how and when the conspiracy was formed, or when each participant entered it, need not be revealed before trial.' United States v. Feola, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987). Generally, the Government is under no obligation to disclose all the overt acts it will use to prove a conspiracy charge. See United States v. Carroll, 510 F.2d 507, 509 (2d Cir. 1975), cert. denied, 426 U.S. 293, (1976). Here, the Indictment contains sufficiently detailed information relating to the conspiracy to allow the defendants to defend themselves. Indeed, the Indictment provides defendants with an entire section relating to overt acts in furtherance of the conspiracy, many of which include acts taken by Mannino (see, e.g., Ind. ¶76(i)). Accordingly, Mannino's requests one through seven are denied.

Mannino's final three requests relating to the fraudulent representations, threats and sales practice violations are granted based on my prior analysis in this Memorandum and Order.

### 5. Robert Lisnoff

The majority of Lisnoff's requests for particulars have already been covered by my prior analysis. He first asks for the "methods" that the brokers used to inflate demand for the House

---

[2] Joseph Mannino is no longer a movant in this case. However, his motions are still addressed to the extent that they are relevant to other defendants that joined in the motions of all the moving defendants.

13

Stock referred to in ¶¶ 44 and 50 of the Indictment. This request is denied. First, the Government need not disclose the precise methods used by a defendant to commit the crime charged. (See my analysis of Hunter Adams's second request.) Additionally, the Indictment lists seven methods that defendants used to inflate the price of the House Stock (Ind. ¶ 44), and it enumerates six methods that defendants used to maintain the inflated price of the House Stocks. (Ind. ¶ 50). That, taken together with the disclosures the Government will be making pursuant to this order, provides the defendants with ample information to prepare for trial.

Lisnoff's requests relating to ¶¶ 86 and 88 of the Indictment are justified, as the Indictment (the Securities Fraud Counts for House Stocks Americom and Global) makes no mention of how Lisnoff participated in these acts. However, the disclosures the Government will be making relating to ¶¶ 44 and 50 of the Indictment may provide Lisnoff with sufficient information to know of what specific acts he is accused of committing. To the extent they do not, the Government must inform Lisnoff of the specific wrongdoing of which he is accused.

Lisnoff's request for information regarding the identity of known and unknown co-conspirators is denied for the same reasons I denied Cohen's first request.

### 6. David Hirsch

Most of David Hirsch's requests for particulars are justified. He is charged with one count of conspiracy and four substantive counts of securities fraud, yet the Indictment provides no specific information regarding these accusations. However, most of Hirsch's requests might be disclosed along with the information the Government will be providing pursuant to this order. Specifically, the information relating to ¶¶ 44 and 50 that the Government will be disclosing may provide Hirsch with detailed acts of which he is accused. To the extent that it is not, the

14

Government must specify the manner in which Hirsch participated in the fraud and of what acts
he stands accused.

Hirsch's request relating to the identity of the nominees and nominee accounts is granted.
However, his request relating to the unidentified customers is denied, as the Government has
provided sufficient information relating to those acts. Specifically, the Indictment lists the dates,
quantity and types of securities that were sold.

### 7. Michael Reiter

All but one of Michael Reiter's requests do not attempt to clarify the charges against him.
Instead, they seek to determine very specific information relating to the acts of which he is
accused. The function of a Bill of Particulars is to inform the defendant of the nature of a charge;
it is not to be used an investigative tool for the defense. United States v. Jimenez, 824 F .Supp.
351, 362 (S.D.N.Y. 1993). The Government is not required to disclose the exact methods used
by defendants to commit the crimes charged. Id. The Indictment is sufficiently detailed to
apprise Reiter of the nature of the charges against him. Accordingly, Reiter's requests one
through four and six through eighteen are denied. His fifth request is the only one that attempts
to clarify the nature of a charge. It asks "whether the Government alleges that Reiter was
involved in any prearranged trades in IRT stock." The Government is directed to inform Reiter
whether he is accused of being involved in any pre-arranged trades of IRT stock.

The Government must provide a Bill of Particulars consistent with the foregoing rulings.
The Government expresses legitimate concerns that a Bill of Particulars might unduly harm its
case as it will confine the Government's proof to the particulars, see Feola, 651 F. Supp. at
1132. To address this concern, the Government may supplement its Bill of Particulars to include

15

newly discovered information as necessary.

## III. Suppression of Electronic Communications and Telephone Records

### A. The Pager

On June 23, 1997, Judge Raggi authorized law enforcement officials to intercept electronic communications sent to Defendant Reiter's pager. Under 18 U.S.C. § 2518(3), a judge may authorize interception of electronic communications, if the judge determines that, among other requirements, there is probable cause that the target is committing an enumerated crime; and that ordinary investigative procedures are unlikely to succeed. Reiter moves to suppress all information obtained through the interception of these communications, claiming that the affidavit in support of the interception did not establish probable cause and that it failed to establish that normal investigative procedures would not have been successful.

#### 1. Probable Cause

In determining if probable cause exists, information provided by a reliable informant is likely sufficient. See United States v. Wagner, 989 F.2d 69, 73 (2d Cir. 1993). "Even where an informant has no proven record, if an informant's declaration is corroborated in material respects, the entire account may be credited, including parts without corroboration." Id. Where the court is evaluating a wiretap that has been previously authorized, "doubts as to the existence of probable cause must be resolved in favor of the prior judicial authorization." United States v. Gotti, 42 F. Supp. 2d 252, 262 (S.D.N.Y. 1999).

In June of 1997, F.B.I. agent Robert A. Vandette ("Vandette"), signed an affidavit in support of obtaining authorization for the interception of electronic communications sent to Reiter's pager. The following information which is derived from that affidavit demonstrates that

16

there was probable cause that Reiter was committing or about to commit various enumerated offenses. Confidential Source 1 ("CS-1"), has been a reliable government informant for over six years. Over those six years, he reported on the activities of high ranking members of various crime families, among them the Gambino Crime Family. His basis of knowledge came from conversations he had with members and associates of those families.

In 1995, CS-1 reported that Michael Reiter was associated with the Gambino Crime Family and that he has recently been reporting to Gambino associate John Cavallo. He later reported that Reiter was involved in stock fraud schemes with other members of the Gambino Crime Family and that his partner in those schemes was an individual named Barry. One of the schemes employed by him and Barry involved extorting brokerage houses.

Confidential Source 2 ("CS-2") was a reliable government informant as well. He too provided information regarding various crime families and has never been found to provide untruthful information. Additionally, his basis of knowledge came from members and associates of those crime families.

In 1997, CS-2 reported that Reiter was an associate of the Gambino Crime Family and that he reported to Gambino associate Jack Cavallo. He also reported the following: (i) Reiter was involved in extorting brokerage houses; (ii) Reiter's partner in these endeavors was Barry Gesser ("Gesser") (he obtained this information directly from Reiter); and (iii) Reiter used beeper number (516) 434-4108 to receive messages from victims and co-conspirators.

The information that CS-1 and CS-2 provided was corroborated in the following ways: (i) In 1997, Reiter was observed walking into First Cambridge Securities Corporation, a business which was allegedly being extorted by Reiter and Gesser; (ii) Mobile Communications confirmed

17

that pager number (516) 434-4108 belonged to Reiter; (iii) between September of 1996 and February of 1997, 199 phone calls were made from Reiter's home phone to one of Gesser's places of business; and (iv) between May of 1996 and January of 1997, 89 calls were made from Gesser's place of business to Reiter's pager.

The above mentioned information demonstrates that there was probable cause to believe that Reiter was committing or about to commit enumerated offenses. First, two reliable informants provided information that Reiter was involved in extorting brokerage houses. One of those informants has been providing accurate information for over six years and the other has been providing accurate information for less than four years. That alone may be sufficient to establish probable cause regarding the information they related. See Wagner, 989 F.2d at 73. Additionally, their information was corroborated by their overlapping reports and by the many factual confirmations mentioned above. This demonstrates that there was probable cause. Furthermore, to the extent that doubt exists regarding the probable cause determination, I must give deference to Judge Raggi's findings that there was probable cause. See Gotti, 42 F. Supp. 2d at 262.

## 2. Alternative Investigative Techniques

In determining if normal investigative procedures have been pursued, there is no requirement that all possible techniques be utilized prior to authorizing a wiretap. See United States v. Martino, 664 F.2d 860, 868 (2d Cir. 1981). "In short, the requirement is 'simply designated to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" Id. (quoting United States v. Kahn, 415 U.S. 143, 153 n. 12 (1974)).

18

Here, Vandette confirmed that other investigative techniques have failed or are likely to fail in achieving the goals of the investigation. Among the information the investigating authorities sought to obtain through interception of communications to the pager was the identities of co-conspirators and victims of the extortion. Reiter suggests that this information could have been obtained through government informants and physical surveillance of the suspects. However, Vandette's affidavit clearly states that the informants did not have all of this information. Additionally, Vandette's affidavit confirms that physical surveillance had been conducted, but it failed to provided law enforcement officials with sufficient information. The surveillance was not productive for various reasons. First, Reiter and Gesser avoided open encounters with members of organized crime. Additionally, the investigating authorities had to avoid intensive surveillance because it may have alerted the suspects of the investigation. Finally, the illegal activity was carried out in a covert fashion so that surveillance did not provide sufficient detail to the covert activity.

Vandette's affidavit demonstrates that there was probable cause that offenses were being committed and that use of normal investigative procedures did not and would not provide law enforcement officials with the information they required to proceed with the investigation. Accordingly, Reiter's motion to suppress evidence derived from interception of electronic communications sent to his pager is denied.

## B. The Cellular Phone Records

On August 13, 1997, Magistrate Judge Mann ordered AT&T Wireless Services to disclose to the F.B.I. billing records related to Reiter's wife's cellular phone. The Electronic Communications Privacy Act ("ECPA") provides that a court order for disclosure of the contents

19

of electronic communications shall be issued "only if the government entity [making the application] offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C § 2703(d). Reiter moves to suppress evidence revealed from the phone records. He argues that the affidavit in support of the authorization did not satisfy the requirement of providing "specific and articulable facts" indicating that the records sought were relevant and material to an ongoing investigation.

The ECPA does not provide for suppression of evidence as a remedy for information obtained in violation of § 2703. Section 2708 provides that "The remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter." Because the Statute only calls for civil remedies, see § 2707, suppression of evidence would be an inappropriate remedy for violation of § 2703. See United States v. Daccarett, 6 F.3d 37, 51 (2d Cir. 1993) (applying an identical analysis to the Right to Financial Privacy Act); and United States v. Charles, 1998 WL 204696 at *21 (D. Mass. Jan. 13, 1998). Because the ECPA does not authorize suppression of evidence as a remedy for violation of § 2703, I need not determine whether Judge Mann's order was in compliance with § 2703. Accordingly, Reiter's motion is denied.[3]

_____

[3]Had Reiter raised the Fourth Amendment as grounds for suppression, I would have denied that as well because "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." United States v. Miller, 425 U.S. 435, 443 (1976).

20

## IV. Motion to Strike Language in the Indictment as Prejudicial and Misleading

Defendants Hunter and Gregg Adams seek to strike ¶ 44(iii) from the Indictment.
Paragraph 44(iii) states that Defendants "paid and accepted excessive, undisclosed commissions
and sales credits to recommend and sell House Stocks, including allocation of House Stock, cash
payments, and other items of value." Additionally, Hunter Adams seeks to strike all references to
the fact that he was an associate of the Gambino Organized Crime Family. See Ind. ¶ 15.

Under Rule 7(d) of the Federal Rules of Criminal Procedure, "The court on motion of the
defendant may strike surplusage from the indictment." Motions to strike, however, "will be
granted only where the challenged allegations are not relevant to the crime alleged and are
inflammatory and prejudicial.". United States v. Peterson, 168 F. Supp. 2d 51, 56 (E.D.N.Y.
2001) (quoting United States v. Hernandez, 85 F.3d 1023, 1030 (2d Cir. 1996)). The Second
Circuit has held that charging exorbitant commissions imposes a duty upon the broker to disclose
the commissions to the customer. See United States v. Szur, 289 F.3d 200, 211-12 (2d Cir.
2002).

Here, the Government contends that it will prove at trial that the commissions charged
were exorbitant and therefore the brokers were under a duty to disclose information relating to
the commissions to their customers. To the extent that the Government demonstrates that the
defendants charged exorbitant commissions, it will be relevant to the crimes charged because it
establishes that the brokers had a duty to disclose the commissions to their customers.
Accordingly, the motion to strike ¶ 44(iii) from the Indictment is denied.

Hunter Adams's motion to strike references to his association with the Gambino Crime
Family is denied as well. The Government maintains that it will prove at trial that the alleged

21

threats directed at brokers and investors were made, in part, by members of the Gambino Crime

Family. Because these references are relevant to the crimes charged, the motion is denied.

## V Other Motions Relating to Discovery

### 1. Pre-Trial Disclosure of Brady and Giglio Material[4]

Defendants Cohen, Mannino, Reiter and Hirsch have all made motions for early

production of Brady and Giglio material. In United States v. Coppa, 267 F.3d 132, 143 (2d Cir.

2001), the Second Circuit suggested that the distinction between Brady and Giglio material was

no longer important for pre-trial disclosure and held:

> Accordingly, we reiterate the longstanding constitutional principle that as long as a
> defendant possesses Brady evidence in time for its effective use, the government has not
> deprived the defendant of due process of law simply because it did not produce the
> evidence sooner. There is no Brady violation unless there is reasonable probability that
> earlier disclosure of the evidence would have produced a different result at trial, see, e.g.,
> United States v. Romero, 54 F.3d 56, 61 (2d. Cir. 1995); United States v. Bejasa, 904
> F.2d 137, 140 (2d Cir. 1990), or at a plea proceeding, see Persico, 164 F.3d at 804.

Id. at 144 (emphasis added).

Here, the Government acknowledges its requirement to disclose Brady and Giglio

material and it agrees to disclose Brady material "when [they] become aware of its existence."

Governments Memorandum of Law in Opposition to Defendants' Pre-Trial Motions ("Gov.

Mem.") at 23. Additionally, the Government intends on disclosing Giglio material in advance of

trial. Id. While the Government's assurances are comforting, the Government must disclose

these materials not merely in advance of trial, but sufficiently prior to trial so as to allow

Defendants to make "effective use" of the material at trial. I am not designating a specific date

---

[4]Brady and Giglio material refer to evidence that tends to exculpate the accused as well as
evidence that may be used to impeach the credibility of a government witness. See Coppa, 267
F.3d at 139.

22

upon which the Government must disclose these materials, but the Government must disclose them in compliance with the standard.[5]

## 2. Pre-Trial Disclosure of Rule 404(b) Evidence

Defendants Cohen and Mannino request that the Government provide notice of 404(b) materials, to the extent it plans on using them at trial. Rule 404(b) of the Federal Rules of Evidence provides that evidence of prior crimes, wrongs or acts may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial."

The Government has agreed to provide the Defendants with this information three weeks in advance of trial. See Gov. Mem. at 25. Three weeks prior to trial is sufficient for the Government to comply with its obligation. See, e.g., United States v. Heatley, 994 F. Supp. 483, 491 (S.D.N.Y. 1998). To the extent that Defendants seek this material prior to three weeks before the trial, their motions are denied.

Mannino's motion asking the Government to disclose detailed information regarding the 404(b) evidence goes far beyond what the Rule requires. The Rule requires the prosecution to provide notice of the "general nature of any such evidence." FED. R. EVID. 404(B) (emphasis added). The Advisory Committee "considered and rejected a requirement that the notice satisfy the particularity requirements normally required of language used in a charging

---

[5]This standard applies both to Brady and Giglio material. See Coppa, 267 F.3d at 139. Therefore, to the extent that the Government complies with the standard, it need not disclose Brady and Giglio material simultaneously. Accordingly, Reiter's objection to different production schedules is without merit, provided that they are both disclosed in compliance with the standard outlined in Coppa.

instrument...Instead the Committee opted for a generalized notice provision." FED R. EVID. 404(b) Advisory Committee's Note. Accordingly, the Government need only disclose information that will provide the Defendants with the "general nature" of such evidence, not specific details.

### 3. Disclosure of the Identity of Confidential Informants

Defendant Mannino seeks to compel the Government to disclose the identity of the Government's confidential informants. In general, a defendant can establish a right to disclosure "where the informant is a key witness or participant in the crime charged, someone whose testimony would be significant in determining guilt or innocence." United States v. Saa, 859 F.2d 1067, 1073 (2d Cir. 1998)(quoting Roviaro v. United States, 353 U.S. 53 (1957)). However, it is the defendant that bears the burden of establishing the necessity of such disclosure. See United States v. Jones, 2000 WL 1448640 at *4 (S.D.N.Y. Sep. 28, 2000). Here, Mannino has not demonstrated that such disclosure is necessary. Therefore, his motion is denied.

### 4. Disclosure of Jenks Act Material and Government Witness List

Defendant Mannino moves to compel the Government to disclose materials under the Jenks Act, 18 U.S.C. § 3500, three weeks prior to trial. Under § 3500, the Government is not required to disclose statements of Government witnesses until after the witnesses testify. See United States v. Ashley, 905 F. Supp. 1146, 1169 (E.D.N.Y. 1995). Here, the Government has voluntarily agreed to disclose these materials two weeks prior to trial. Gov. Mem. at 24. Accordingly, Maninno's motion is denied.

Mannino's request for a witness list is denied as well. Rule 16 of the Federal Rules of Criminal Procedure does not require the Government to produce a witness list upon request.

24

Additionally, the Government agrees to provide a witness list shortly before trial. See Gov. Mem. at 27. While it is true that a court may order such disclosure under appropriate circumstances, see United States v. Taylor, 707 F. Supp. 696, 703 (S.D.N.Y. 1989), Mannino has failed to demonstrate a need for such disclosure in this particular case.

### 5. Disclosure of Government's Threats to Witnesses

Mannino requests that the Government disclose "all threats by the Government, express or implied, direct or indirect, or other coercion made or directed against witnesses, or criminal prosecutions, investigations or potential prosecutions pending or which could be brought against the witnesses." See Joseph Mannino's Notice of Motion at V. In United States v. Sutton, 542 F.2d 1239 (4th Cir. 1979), the court reversed a conviction where the prosecutor told the jury that "no one threatened" a key witness, when later cross-examination revealed that a key witness was in fact threatened with prosecution. Id. at 1241-42. The court held "We perceive no difference between concealment of a promise of leniency and concealment of a threat to prosecute. Id. at 1242. Here, there is no indication that any of the Government's witnesses were threatened with prosecution. However, to the extent that the Government is aware of explicit or direct threats made against its witnesses, it must disclose those threats.

### 6. Disclosure of Grand Jury Transcripts

Mannino moves for the disclosure of the transcripts of grand jury testimony, as well as any other testimony before any securities regulatory agency or self-regulatory organization. Grand jury testimony is secret unless the defendant demonstrates a compelling reason for such disclosure. See United States v. Procter and Gamble, 356 U.S. 677, 682 (1958). Otherwise, an indictment which is valid on its face is sufficient to warrant a trial on the merits. See Costello v.

25

<u>United States</u>, 350 U.S. 359, 363 (1956). Here, Mannino has failed to demonstrate a compelling need for such disclosure. Accordingly his motion is denied.

### 7. Identification of Documents the Government Intends to Introduce at Trial

Defendant Hunter Adams requests that the Government identify documents it intends on introducing in its case-in-chief, relating to his involvement in the brokerage firms, his ownership and control of the House Stock, his manipulation of the price of the House Stock and other related documents. Adams cites to many cases where courts required the Government to identify documents it intended on using at trial. <u>See, e.g.</u>, <u>United States v. Poindexter</u>, 727 F. Supp. 1470 (D.D.C. 1989); and <u>United States v. Trie</u>, 21 F. Supp.2d 7 (D.D.C. 1998). In those cases, the requests were granted to avoid surprise at trial and to provide the defendants with notice of what the Government would be proving at trial. Here, the allegations of the Indictment, taken together with the information the Government is required to disclose pursuant to this Memorandum and Order, will provide the Adams with the information he seeks. Accordingly, his motion is denied.

### Conclusion

Seven defendants in this case have made extensive pre-trial motions relating to a variety of matters. I am reserving judgment on the motions relating to severance of the trial. The remaining motions have been decided by this Memorandum and Order. To the extent that any other motions were not specifically addressed in this Memorandum and Order, those motions have been considered and are hereby denied.

SO ORDERED.

Dated: October 31, 2002
     Brooklyn, N.Y.

Nicholas G. Garaufis
United States District Judge

26