

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JB:RB:DDB/EMN
F.#2007R00730

*271 Cadman Plaza East*

*Brooklyn, New York  11201*

October 2, 2008

The Honorable Jack B. Weinstein
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:  United States v. Joseph Agate, et al.
           Criminal Docket No. 08-76 (JBW)

Dear Judge Weinstein:

      The government respectfully writes in advance of the hearing scheduled for October 6, 2008 to set forth its position concerning the proper restitution amount owed by each defendant in the above-referenced matter.

      In sum, the government seeks full restitution for the victims of crimes to which the defendants pled guilty.  Because multiple defendants conspired to commit many of the same offenses, the government proposes that defendants be held jointly and severally liable for the losses incurred in crimes to which they pled, ensuring full compensation for their victims, but preventing the possibility of multiple recovery by any victim.  To this end, following a recitation of the relevant facts and applicable law, the government sets forth charts detailing the information necessary to set appropriate restitution for each defendant — the loss amount for each crime, the defendants appropriately held jointly and severally responsible for such losses, and the total restitution amounts properly assessed to each defendant based on the crimes to which they pled guilty.

I.   Facts

      To determine the appropriate restitution for each defendant, it is necessary to first briefly review certain relevant facts pertaining to those crimes of conviction which give rise to restitution.  Such crimes include multiple extortions of an individual identified in the indictment as John Doe #4 as well as a fraud on a labor union.

A.  The Extortions of John Doe #4

   1.  Relevant Background

In January 2005, agents arrested John Doe #4 in possession of approximately one-half kilogram of cocaine. He immediately agreed to cooperate. To implement his proactive cooperation, agents instructed John Doe #4 to, among other things, (1) record conversations with members and associates of organized crime, as well as other individuals engaged in illegal activity, and (2) to avoid alerting targets of the investigation to his cooperation, continue making extortion payments to members of the Gambino crime family of La Cosa Nostra (the "Gambino family").

In this regard, during his initial debriefings, John Doe #4 informed agents that he had been making extortion payments to members of the Gambino family for the trucking and cement businesses he owned at the time. He also indicated that various construction officials had also demanded extortion payments if he wished to continue working on certain trucking contracts and to receive certain others. As per his handling agents' instructions, John Doe #4 continued to make extortion payments.

In late June 2005, Gambino family captain Nicholas Corozzo instructed defendant Mario Cassarino, a soldier in Corozzo's crew, to bring John Doe #4 to meet with Corozzo. Corozzo and John Doe #4 shared a cell together at Fort Dix for approximately one year in the late 1990s, and Corozzo informed John Doe #4 that when Corozzo was released from prison, he would put John Doe #4 in his crew. At the June 2005 meeting, Corozzo told John Doe #4 that he would indeed be placed under Corozzo's control, and that since Corozzo was on supervised release and could not openly consort with convicted felons, he would be controlled by defendant Leonard DiMaria, another Gambino family captain and Corozzo's longtime partner in crime.

Over the next two-and-a-half years, John Doe #4 worked to build his existing trucking and concrete businesses, and started a number of new ventures in the construction field. As detailed below, for every business John Doe #4 ran, DiMaria and Corozzo demanded, John Doe #4 paid, and various members of the Gambino family collected, substantial extortion payments. In each instance, while Corozzo, DiMaria and various other Gambino family members suggested that they could add value to these businesses through the Gambino family's connections in the construction industry, the promises were never fulfilled. John Doe #4 thus paid all the money extorted from him by the Gambino

3

family, but did not receive anything in return.

Notably, despite his status as a cooperating witness throughout much of the period during which he was extorted, John Doe #4 at no point received any money from the government for his cooperation, nor did the government provide him with or reimburse him for any of the money he paid to his extortioners. As such, the extortion amounts John Doe #4 paid his extortioners were his actual out-of-pocket losses.

2. The Extortions

With this background, the government addresses the various extortions of John Doe #4 which give rise to restitution.[1]

(a) Trucking Extortion: $128,800

In the mid-1990's, John Doe #4 and defendant Joseph Spinnato formed a trucking company. Following the company's founding, while John Doe #4 was incarcerated, defendant Thomas Cacciopoli, a Gambino family captain, recovered a debt owed to the company and, in return, demanded monthly extortion payments from that point forward.

In 1999, John Doe #4 was released from prison and began making extortion payments to Cacciopoli. From that time until the arrests in this case, John Doe #4 paid $128,800 in extortion related to the trucking business. See Exhibit A. John Doe #4 made cash payments directly to Cacciopoli and to defendant Joseph

---

[1] The government is not seeking restitution for four victims identified in the Probation Department's report. There appears to be no basis to seek restitution for ADCO Electrical Corporation or Local 731 as no defendant pled guilty to an offense relating to either entity. Defendant William Scotto did plead guilty to extorting El Camino Trucking, but, as of the date of this letter, the company has not requested that a restitution order be imposed. Finally, with respect to Local 282, defendants Joseph Spinatto and Sarah Dauria pled guilty to mail fraud conspiracy stemming from Spinatto and John Doe #4's failure to pay union wages to certain employees in violation of their collective bargaining agreement with the union. Spinnato and Dauria, a bookkeeper who facelifted the fraud, should not be required to pay restitution for this crime because John Doe #4 has already repaid the union more than $850,000 in restitution and fines, fully compensating Local 282 for its losses.

Scopo, a Gambino family soldier under Cacciopoli's control, who collected the payments on Cacciopoli's behalf on numerous occasions.  In addition, defendant Robert Epifania, a Gambino family soldier, on multiple occasions relayed instructions from Cacciopoli to John Doe #4 concerning the extortion of John Doe #4.

        (b)   <u>Staten Island Cement Profits Extortion: $62,496</u>

In late December 2003, John Doe #4 and Spinnato decided that they wished to open a cement plant on Staten Island.  At the time, John Doe #4 knew that the Gambino family maintained tight control over the production of cement in New York City and that any attempt to open a cement plant in Staten Island without the blessing of the Gambino family administration would be dealt with harshly, through violence.  As such, John Doe #4 and his partner asked defendants Thomas Cacciopoli and Louis Filippelli, a Gambino family captain, to help them obtain the necessary mafia approval.

Following a series of meetings with the Gambino family administration, Cacciopoli and Filippelli secured permission for John Doe #4 to open the plant on the condition that he make monthly extortion payments to the Gambino family.

John Doe #4 began making the extortion payments in May 2005.  As of the arrests in this case nearly three years later, he had made 22 cash extortion payments totaling $62,496 to various members of the Gambino family.  <u>See</u> Exhibit B.  The initial extortion payments were collected by defendant Vincent Pacelli, a Gambino family soldier, on behalf of the then incarcerated Filippelli.  After Nicholas Corozzo, assumed control of John Doe #4 in late June 2005, extortion payments were collected on his behalf for the Gambino family administration by Leonard DiMaria, Mario Cassarino and defendant Ernest Grillo, another Gambino family soldier.

        (c)   <u>Staten Island Cement Sale Extortion: $8,000</u>

During the spring of 2007, a large, publicly traded company free of ties to organized crime offered to buy John Doe #4's Staten Island cement company.  In keeping with instructions from Nicholas Corozzo and Leonard DiMaria to consult them before making any decisions concerning his businesses, John Doe #4 informed DiMaria of the offer.  DiMaria checked with his superiors and then ordered John Doe #4 to make the sale and pay $100,000 of the proceeds to the Gambino family administration.

In January 2008, John Doe #4 sold his Staten Island cement company. Thereafter, defendant Joseph Corozzo, the Gambino family consigliere, through defendant Augustus Sclafani, a Gambino family acting captain, ordered John Doe #4 to deliver the $100,000 for the Gambino family administration to Sclafani, who said that he would in turn give it directly to Joseph Corozzo. Later, Nicholas Corozzo and DiMaria ordered John Doe #4 to deliver the money to DiMaria for distribution to the administration.

In late January 2008, on Nicholas Corozzo and DiMaria's command, John Doe #4 made the initial $8,000 cash extortion payment of the cement plant sale proceeds to DiMaria. One week later, the defendants were arrested.

Multiple members of the Gambino family informed John Doe #4 that the payments relating to his Staten Island cement company were passed along to the Gambino family administration, and that in addition to Joseph Corozzo, the administration consisted of defendants John D'Amico and Domenico Cefalu, the acting boss and acting underboss, respectively. All three administration members pled guilty to this extortion.

(d)  The Proposed NASCAR Site Extortion: $8,000

In January 2006, a subsidiary of International Speedway Corporation had begun working to develop a large property on Staten Island (the "NASCAR site") for the construction of a NASCAR racing oval. Developing the site involved trucking in millions of cubic yards of fill, a job for which John Doe #4's large trucking business was well suited.

Given that the Gambino family exercised effective control over John Doe #4's businesses, defendants Ernest Grillo, Domenico Cefalu, Leonard DiMaria, Gambino family soldier Vincent Dragonetti, Nicholas Corozzo and Gambino family captain Frank Cali decided that John Doe #4 would be required to pay extortion money to the Gambino family for any work that he received at the NASCAR site. For a short time thereafter, John Doe #4's trucking company worked at the site. In accord with the Gambino family's demands, John Doe #4 made two extortion payments totaling $8,000 which were collected by Mario Cassarino.

(e)  Kilgannon/Polakoff Extortion: $9,000

In the summer of 2006, defendant Todd Polakoff, an employee working for the company developing the NASCAR site,

demanded that John Doe #4 make payments to him in connection with John Doe #4's work on the site.  In response, in September 2006, John Doe #4 paid Polakoff $9,000, which Polakoff then split with his boss, defendant William Kilgannon.[2]

(f)  Liberty View Harbor Extortion: $221,741

In April 2006, Nicholas Corozzo and Vincent Dragonetti directed John Doe #4 to open a portable cement plant at the Liberty View Harbor construction site in Jersey City, New Jersey. VMS Construction, a company owned by defendant Anthony Scibelli, a Gambino family associate controlled by Dragonetti, served as general contractor.  In addition to the portable cement plant, John Doe #4's excavation business and pump truck also performed work at the Liberty View Harbor site.

Under the terms dictated to him by Corozzo, Dragonetti and Leonard DiMaria, John Doe #4 paid the Gambino family 60% of his profits for any work performed at the Liberty View Harbor site.  In addition, Scibelli and Dragonetti demanded that John Doe #4 pay an additional $6 to $7 for each yard of cement produced by his plant, as well as extortionate payments relating to his other two businesses.

Under these terms, over the course of the extortion, John Doe #4 made extortion payments to the Gambino family totaling $221,741.  See Exhibit C (detailing the $105,785 in payments associated with $6 to $7 per yard poured) and Exhibit D (detailing the $115,956 in payments related to John Doe #4's profits).[3]

---

[2]  Kilgannon and the government have agreed that Kilgannon's restitution obligation to John Doe #4 for this extortion should be $4,500.  The Court ordered this amount payable within 30 days in an order dated October 2, 2008.  (Docket Entry No. 1333 at 3.)

[3]  The Probation Department estimates the total loss for the Liberty View Harbor extortion to be $362,176 and breaks that amount into three components.  The first two components, $96,345 and $19,611, represent extortion payments made by John Doe #4 to Dragonetti, Nicholas Corozzo and Leonard DiMaria, and equal the $115,956 figure noted in text.  The third component, $246,220, is overstated.  It includes $125,000 in equity for which the government is not seeking restitution.  The remainder, $121,220, overstates the payments John Doe #4 made to Scibelli by $15,435. As set forth in Exhibit C, John Doe #4 made $105,785 in extortion payments to Scibelli, which, when included with the payments made to the other co-defendants, totals $221,741.

(g)  Cement Powder Extortion: $6,000

In October 2007, Leonard DiMaria and Nicholas Corozzo directed John Doe #4 to supply his former portable cement plant (which had since been appropriated by Anthony Scibelli with Corozzo and DiMaria's backing) with the powder it would need to make cement, and to provide 60% of his profits relating to the cement powder deliveries to be split between Corozzo, DiMaria and Dragonetti. As directed, from that period through the arrests, John Doe #4 paid $6,000 in extortion related to the cement powder.

(h)  Excavation Extortion: $35,000

In approximately January 2006, Nicholas Corozzo instructed John Doe #4 to start an excavation business which, after a short period in which John Doe #4 would be allowed to operate the business without making extortion payments, would be required to pay 60% of its profits to Corozzo, Vincent Dragonetti and Leonard DiMaria. John Doe #4 did as he was told and began making these extortion payments a few months after starting the business. From that time until DiMaria and Dragonetti were arrested and Corozzo took flight, John Doe #4 paid $35,000 in extortion related to the excavation business to DiMaria and Dragonetti, who collected the payments on Corozzo's behalf. See Exhibit E.

(i)  Jerome Brancato Extortion: $4,000

In July 2006, Leonard DiMaria informed John Doe #4 that John Doe #4's father, who had previously been under Gambino family soldier Jerry Brancato's control, would need to once again start paying extortion money to the then jailed Brancato. In late 2006, when Brancato was released from prison, DiMaria instructed John Doe #4 to have his father provide Brancato with extortion money. In response, John Doe #4 paid $2,500 to Vincent Dragonetti, who collected the extortion money for Brancato.

In January 2008, Nicholas Corozzo told John Doe #4 that Brancato had passed a message to him through defendant Joseph Chirico, a Gambino family solider, that his father failed to provide Brancato with "Christmas money" — a year-end tribute payment. Corozzo instructed John Doe #4 to make sure that the extortion money from his father was given to Chirico, who would collect it for Brancato. The following day, John Doe #4 gave Chirico $1,500 for Brancato.

8

        (j)   <u>Schiavone Construction Extortion: $119,700</u>

In late 2004, defendant Nicholas Calvo, a Genovese family associate, and Michael King, a project manager at Schiavone Construction and the son of a top Schiavone executive, proposed to John Doe #4 that he could receive lucrative trucking contracts with Schiavone provided he make extortion payments to King and Calvo. As of the date of the arrests, John Doe #4 paid $119,700 to Calvo and King under this arrangement.[4] <u>See</u> Exhibit F.

    B.   <u>Union Local 325 Fraud: $37,512</u>

In fall 2005, Leonard DiMaria asked John Doe #4 to obtain union membership for his brother-in-law, defendant Joseph Agate. In response, John Doe #4 contacted Nicholas Calvo, who directed him to defendant Louis Mosca, the business manager for New Jersey Laborers' Local 325 ("Local 325"). In return for $2,000, Mosca obtained Local 325 membership for Agate without making Agate follow proper procedures. Agate began working for the union soon thereafter.

The Honest Services Mail Fraud Conspiracy to which Mosca and Agate pled guilty spanned approximately 10 months -- from September 16, 2005 to July 14, 2006, or approximately 83% of one year. Mosca's annual salary with Local 325 was $45,196; 83% of that amount is $37,512, which is a reasonable approximation of the loss to the union of Mosca's honest services for that period.[5]

III. <u>Applicable Law</u>

Restitution in this case is governed by the Mandatory Victims Restitution Act of 1996 ("MVRA"), which was codified in relevant part at 18 U.S.C. §§ 3663A and 3664 and applies to offenses ending after the effective date, April 24, 1996. The MVRA makes restitution mandatory for certain offenses, including crimes of violence such as extortion, and offenses that involve fraud or deceit. <u>See</u> 18 U.S.C. § 3663A(c)(1)(A). Victims of crime need not participate in restitution proceedings in order to recoup their losses. <u>See</u> 18 U.S.C. § 3664(g)(1) ("No victim

---

     [4]   The Probation Department's estimate is $4,700 lower.

     [5]   Mosca's plea agreement stipulates that restitution is not applicable. The government is therefore only seeking restitution as against Mosca's co-defendants.

shall be required to participate in any phase of a restitution order.").

The MVRA defines "victim" as follows:

> [T]he term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

Id. § 3663A(a)(2). In other words, where, as here, the conduct underlying the offense of conviction involves a scheme, conspiracy or pattern, restitution may be ordered as to all victims of losses attributable to the entire scheme, conspiracy or pattern in which the defendant was involved. See United States v. Dupre, 2007 WL 1589451, at *5 (S.D.N.Y. Jun. 4, 2007).[6] Additionally, a defendant convicted of conspiracy may also be ordered to pay restitution to all victims of the entire conspiracy, even if he himself had directly participated in conduct that caused only some of the losses. See Chu v. United States, 2008 U.S. Dist. LEXIS 27942, at *12 (S.D.N.Y. Mar. 20, 2008); United States v. Collins, 209 F.3d 1, 4 (1st Cir. 1999) (holding that, "[i]n context of a conspiracy, it is clear that a defendant is liable in restitution to all victims of the reasonably foreseeable acts of his co-conspirators"); see also United States v. Boyd, 222 F.3d 47, 50 (2d Cir. 2000) (addressing 1990 amendment to VWPA).

Under the MVRA, the sentencing court must order restitution to each victim of an offense without consideration of the defendant's financial circumstances. See id.

---

[6] In Dupre, the defendants were convicted of wire fraud and wire fraud conspiracy. Although the counts of Dupre's conviction covered only the period from 2002 through 2004, the indictment itself alleged that the scheme operated from 1994 through 2004. Since the crimes of that conviction included a scheme to defraud, the court determined that restitution should be imposed "for all losses caused during the course of the criminal scheme," which extended from the earlier date in 1994. Dupre, 2007 WL 1589451 at *5.

§ 3664(f)(1)(A).[7]  The amount of the restitution may be estimated.  See United States v. Futrell, 209 F.3d 1286, 1290-92 (11th Cir. 2000) ("So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution."); United States v. Fogel, 494 F. Supp. 2d 136, 138-39 (D. Conn. 2007) (accepting government's estimate in health care fraud action where amounts billed to victim insurers encompassed both legitimate and illegitimate claims).

Among other things, a defendant must "reimburse the victim for lost income . . . and other expenses incurred during participation in the investigation or prosecution of the offense."  18 U.S.C. § 3663A(b)(4).  Under this paragraph, "investigation costs -- including attorneys' fees -- incurred by private parties as a 'direct and foreseeable result' of the defendant's wrongful conduct 'may be recoverable.'"  United States v. Gordon, 393 F.3d 1044, 1057 (9th Cir. 2004) (quoting United States v. Phillips, 367 F.3d 846, 863 (9th Cir. 2004); see also United States v. Amato, 540 F.3d 153, 159-62 (2d Cir. 2008).

When more than one defendant is involved in the offense of conviction, a sentencing court may order that the restitution obligation be joint and several.  United States v. Nucci, 364 F.3d 419, 422 (2d Cir. 2004) ("It has long been the law of this circuit that the restitution obligation may be ordered to be joint and several.  Thus, it was within the district court's discretion to order that Nucci, who pleaded guilty to a conspiracy to commit multiple robberies, be held jointly and severally liable for the full amount of the restitution.") (citation omitted); United States v. Lino, 327 F.3d 208 (2d Cir. 2003) (affirming district court's joint and several order of $1.5 million restitution obligation against co-defendants in RICO and RICO conspiracy case).  The sentencing court also has discretion to "apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."  18 U.S.C. § 3664(h).

---

[7] The prior restitution statute, the Victim and Witness Protection Act ("VWPA"), required sentencing courts to consider the economic circumstances of the defendant and made restitution discretionary, not mandatory.  See 18 U.S.C. § 3663.  Aside from these two differences, the MVRA and the VWPA are the same in all material respects, and courts interpreting the MVRA are permitted to rely on cases interpreting the VWPA as precedent for determining restitution under the MVRA.  See United States v. Randle, 324 F.3d 550, 555-56 (7th Cir. 2003).

In making restitution decisions under the MVRA, the sentencing court should decide close questions in favor of the victim: "The primary and overarching goal of the MVRA is to make victims of crime whole. In achieving this objective, Congress intended district courts to engage in an expedient and reasonable restitution process, with uncertainties resolved with a view toward achieving fairness to the victim." Gordon, 393 F.3d at 1048; see also United States v. Coriaty, 300 F.3d 244, 253 (2d Cir. 2002) (observing that the "statutory focus" of the MVRA is "on the victim's loss and upon making victims whole"). A sentencing court's order of restitution is reviewed for abuse of discretion. United States v. Reifler, 446 F.3d 65, 120 (2d Cir. 2006).

IV.  The Defendants' Victims Are Entitled to Recoup Their Losses

    A.  John Doe #4's Losses

John Doe #4 is entitled to recoup the payments he made as the victim of the various extortions described above since all such payments were actual out-of-pocket losses. He incurred these losses because the members of the Gambino family and others who extorted him demanded money from John Doe #4 and created a fear in him of the consequences if he were to refuse their demands. The fact that John Doe #4 was cooperating with the government at the time that many of these extortions took place is immaterial to the scope of the defendants' restitution obligation. Neither is John Doe #4 required to testify or otherwise participate in these proceedings in order to obtain restitution. See 18 U.S.C. § 3664(g)(1). The only relevant fact is the loss to John Doe #4, the undisputed victim of the extortions to which the defendants pled guilty.

It also bears emphasis that John Doe #4 did not profit from any crime charged in this case. John Doe #4 pled guilty to one crime that overlapped with an offense charged here. Namely, together with defendants Joseph Spinnato and Sarah Dauria, John Doe #4 defrauded Local 282's health and pension funds by failing to pay union wages to certain of his trucking employees in violation of his company's collective bargaining agreement with Local 282. As noted above, John Doe #4 made full restitution to Local 282 for this crime. Moreover, despite the fact that following the start of his cooperation in January 2005 he took part in this continuing conspiracy with the full knowledge of law enforcement, John Doe #4 paid all monies claimed by Local 282 as well as fines and interest stemming from his company's fraud from 2002 to 2008. This payment of more than $850,000 ensured not only that the union was made whole, but that John Doe #4 did not

ultimately profit from his participation in criminal activity with any defendant in this case. Indeed, because John Doe #4 paid all monies claimed by Local 282 related to his, Spinnato and Dauria's fraud, Spinnato and Dauria have avoided any restitution obligation for their crimes.

Accordingly, as set forth in Table 1, John Doe #4 is entitled to recoup $602,737 in losses from the defendants indicated.[8]

Table 1

| Victim | Extortion Conspiracy Offense | Restitution Obligation | Defendants Jointly and Severally Responsible |
|---|---|---|---|
| JD #4 | Trucking | $128,800 | V. Dragonetti<br>R. Epifania<br>J. Scopo<br>W. Scotto |
| JD #4 | S.I. Cement - Profits | $62,496 | T. Cacciopoli<br>M. Cassarino<br>J. Corozzo<br>N. Corozzo<br>V. Dragonetti<br>R. Epifania<br>L. Filippelli<br>E. Grillo<br>V. Pacelli<br>J. Scopo<br>W. Scotto |
| JD #4 | S.I. Cement - Sale | $8,000 | D. Cefalu<br>J. Corozzo<br>N. Corozzo<br>J. D'Amico<br>L. DiMaria<br>V. Dragonetti<br>A. Sclafani<br>J. Scopo<br>W. Scotto |
| JD #4 | NASCAR | $8,000 | F. Cali<br>M. Cassarino<br>N. Corozzo<br>V. Dragonetti<br>J. Scopo<br>W. Scotto |

---

[8] The rationale with respect to which defendants should be jointly and severally responsible for each obligation is set forth in Section C, below.

13

| Victim | Extortion Conspiracy Offense | Restitution Obligation | Defendants Jointly and Severally Responsible |
|---|---|---|---|
| JD #4 | Kilgannon/Polakoff Payoff | $9,000 | W. Kilgannon[9]<br>T. Polakoff |
| JD #4 | Liberty View Harbor | $221,741 | N. Corozzo<br>V. Dragonetti<br>A. Scibelli<br>J. Scopo<br>W. Scotto<br>A. Zagari |
| JD #4 | Cement Powder | $6,000 | V. Dragonetti<br>J. Scopo<br>W. Scotto |
| JD #4 | Excavation | $35,000 | N. Corozzo<br>L. DiMaria<br>V. Dragonetti<br>J. Scopo<br>W. Scotto |
| JD #4 | Brancato | $4,000 | J. Brancato<br>J. Chirico<br>N. Corozzo<br>V. Dragonetti<br>J. Scopo<br>W. Scotto |
| JD #4 | Schiavone | $119,700 | N. Calvo<br>V. Dragonetti<br>M. King<br>J. Scopo<br>W. Scotto |
| | TOTAL: | $602,737 | |

---

[9] As noted above, the government and Kilgannon have agreed that Kilgannon is liable for $4,500.

14

B. <u>The Union's Losses</u>

Local 325 was also a victim of the defendants' crimes and, as such, is also entitled to restitution, in the amount and from the defendants set forth below:

Table 2

| Victim | Conspiracy Offense | Restitution Obligation | Defendants Jointly and Severally Responsible |
|---|---|---|---|
| Local 325 | Honest Services Mail Fraud | $37,512 | J. Agate<br>V. Dragonetti<br>J. Scopo<br>W. Scotto |

C. <u>Each Defendant's Restitution Obligation</u>

In imposing a restitution obligation, the sentencing court is required to identify each victim's individual loss amount, along with information sufficient to identify all other individuals with whom the defendant is jointly and severally liable. In accordance with common-law principles barring double recovery to victims, each defendant's liability is reduced by payments that a victim receives from a co-defendant who is jointly and severally liable for restitution. See <u>Nucci</u>, 364 F.3d at 423-24. Accordingly, in Table 3 below, the government sets forth its requested restitution obligation by offense of conviction, which will permit the Court to identify the relevant co-defendants should the Court order some or all defendants to be jointly and severally liable with their co-defendants.

As set forth in that table, seven defendants pled guilty to RICO conspiracy, in each case allocuting to predicate acts of extortion conspiracy relating to John Doe #4. For the defendants who pled guilty to RICO conspiracy in Superseding Indictments S-1 and S-11, the government is seeking the imposition of a joint and several restitution order on behalf of John Doe #4 and Local 325 covering all the losses relating to offenses alleged as predicate acts to which one or more defendant pled guilty, whether as a predicate act or as a substantive count. See <u>Dupre</u>, 2007 WL 1589451 at *5; <u>Chu</u>, 2008 U.S. Dist. LEXIS 27942, at *12; <u>Collins</u>, 209 F.3d at 4; <u>Boyd</u>, 222 F.3d at 50. For the defendants who pled guilty to RICO conspiracy in Superseding Informations S-3, S-4 and S-5, which contain only two predicate acts each, the government is also seeking the imposition of a joint and several liability restitution order, but only covering the two predicate acts to which that respective defendant allocuted.

15

Table 3 also includes 18 non-RICO defendants who pled guilty to one or two extortions (or to laundering the proceeds from one of those extortions) relating to John Doe #4, or to fraud relating to the union. For these defendants, the government is seeking the imposition of a joint and several restitution order on behalf of John Doe #4 and Local 325 that covers only the losses relating to the conspiracy or conspiracies to which that defendant pled guilty.

Table 3

| Defendant(s) | Offense(s) of Conviction | Restitution Obligation | Underlying Conspiracies |
|---|---|---|---|
| **RICO Defendants** | | | |
| V. Dragonetti<br>J. Scopo<br>W. Scotto | RICO Conspiracy S-1 | $631,249 | Trucking<br>S.I. Cement - Profits<br>S.I. Cement - Sale<br>NASCAR<br>Liberty View Harbor<br>Cement Powder<br>Excavation<br>Brancato<br>Schiavone<br>Mail Fraud - Local 325 |
| L. DiMaria | RICO Conspiracy S-3 | $43,000 | Excavation<br>S.I. Cement - Sale |
| R. Epifania | RICO/RICO Conspiracy S-4 | $191,296 | Trucking<br>S.I. Cement - Profits |
| J. Corozzo | RICO Conspiracy S-5 | $70,496 | S.I. Cement - Profits<br>S.I. Cement - Sale |
| N. Corozzo | RICO Conspiracy S-11 | $339,237 | S.I. Cement - Profits<br>S.I. Cement - Sale<br>NASCAR<br>Excavation<br>Liberty View Harbor<br>Brancato |
| **Non-RICO Defendants (S-1)** | | | |
| J. Agate | Count 30 | $37,512 | Mail Fraud - Local 325 |
| J. Brancato | Count 68 | $4,000 | Brancato |
| T. Cacciopoli | Count | $62,496 | S.I. Cement - Profits |
| F. Cali | Count 38 | $8,000 | NASCAR |
| N. Calvo | Count 17 | $115,000 | Schiavone |
| M. Cassarino | Counts 10 & 38 | $70,496 | S.I. Cement - Profits<br>NASCAR |
| D. Cefalu | Count 75 | $8,000 | S.I. Cement - Sale |

| Defendant(s) | Offense(s) of Conviction | Restitution Obligation | Underlying Conspiracies |
|---|---|---|---|
| J. D'Amico | Count 75 | $8,000 | S.I. Cement - Sale |
| L. Filippelli | Count 10 | $62,496 | S.I. Cement - Profits |
| E. Grillo | Count 10 | $62,496 | S.I. Cement - Profits |
| W. Kilgannon | Count 46 | $4,500 | Kilgannon/Polakoff Payoff |
| A. Scibelli | Count 59 | $221,741 | Liberty View Harbor |
| A. Sclafani | Count 75 | $8,000 | S.I. Cement - Sale |
| A. Zagari | Count 61 | $221,741 | Money Laundering (Liberty View Harbor) |
| **Non-RICO Defendants (S-2)** | | | |
| V. Pacelli | Count 1 | $62,496 | Money Laundering (S.I. Cement - Profits) |
| **Non-RICO Defendants (S-7)** | | | |
| J. Chirico | Count 1 | $4,000 | Money Laundering (Brancato) |
| **Non-RICO Defendants (S-11)** | | | |
| M. King | Count 4 | $115,000 | Schiavone |
| T. Polakoff | Count 21 | $8,000 | Kilgannon/Polakoff Payoff |

## Conclusion

For the reasons discussed, the government respectfully requests that the Court order restitution in the amounts and in the manner set forth above.

Respectfully submitted,

BENTON J. CAMPBELL
United States Attorney
Eastern District of New York

By:     /s/
Roger A. Burlingame
Daniel D. Brownell
Evan M. Norris
Assistant U.S. Attorneys
(718) 254-7000

cc: Counsel of Record (by ECF)
    Sindee Haasnoot, U.S. Probation Officer (by ECF)